UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Nicole Johnson,                              Court File No. _____

        Plaintiff,

vs.                                          **COMPLAINT**
                                             **(JURY TRIAL DEMANDED)**

Di Ma Corporation,

        Defendant.

Plaintiff, by her attorneys, Fabian May & Anderson, PLLP, brings this action for damages and other legal and equitable relief for Defendant's violations of state and federal laws prohibiting workplace discrimination and retaliation. Plaintiff states the following as her claims against Defendant:

## JURISDICTION AND VENUE

1.     This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. This court has original jurisdiction to hear this Complaint and to adjudicate the claims stated herein under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

2.     Plaintiff also asserts claims under the Minnesota Human Rights Act, Minn. Stat. Ch. 363A.  Jurisdiction for Plaintiff's Minnesota state law claims is conferred upon this Court by 28 U.S.C. § 1367.

3.     The unlawful practices described herein were committed in the District of Minnesota, the employment records relevant to those practices are, upon information and belief, maintained and administered at the offices of Defendant in the District of Minnesota,

and Defendant does business within Minnesota. Therefore, venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

4.      Plaintiff Nicole Johnson ("Plaintiff" or "Johnson") is an individual residing in Sartell, Minnesota.

5.      Defendant Di Ma Corporation ("Defendant" or "DiMa") is a Minnesota corporation with principal executive offices in Albert Lea, Minnesota.

## FACTS RELEVANT TO ALL COUNTS

### I.      JOHNSON'S EMPLOYMENT AS A SERVER AT SUGAR DADDY'S.

6.      DiMa operates several retail and entertainment locations in Minnesota through which it provides adult entertainment and merchandise, including an entertainment location in Sauk Rapids, Minnesota known as "Sugar Daddy's."

7.      Johnson worked at the Sugar Daddy's club from July 2009 until her involuntary termination on May 13, 2017.  She worked most recently as a server.

8.      Throughout the substantial majority of Johnson's employment at Sugar Daddy's, Johnson and one other server worked a rotating three-on-three-off schedule, in which one server would work three days in a row, then take three days off while the other server worked.  The effect of this rotating schedule was to ensure that, over time, each server would work an equal share of weekend shifts (Thursday-Saturday nights), when Sugar Daddy's saw a larger clientele and the servers earned more lucrative tips.

9.      Servers at the club were supervised by club managers, who were in turn supervised by the General Manager Sam Steinbaugh ("Steinbaugh").

## II.     DIMA MANAGEMENT'S HISTORY OF RETALIATORY BEHAVIOR.

10.     Steinbaugh, as well as other DiMa management, including but not limited to its former owner and CEO Mal Prinzing ("Prinzing"), have a long history of engaging in retaliation toward employees for conduct ranging from making legitimate complaints to mere perceived slights.

11.     For example, around a year into Johnson's employment, Steinbaugh rudely criticized Johnson, telling her she looked pregnant when she was not.   When Johnson objected to Steinbaugh's comment, he claimed he was just teasing her about how her uniform made her look.   As Johnson went to leave the conversation, Steinbaugh rudely commented that her "stance doesn't look good."

12.     Johnson reported the incident to DiMa's COO Mark VanGelder ("VanGelder") and told him she was considering filing a formal complaint against Steinbaugh for his rude and sexist comments.   VanGelder advised her against it.

13.     Immediately thereafter, Johnson was taken off the schedule for around two weeks.   DiMa management refused to explain why she was removed from the schedule, but eventually put her back on, again with no explanation.

14.     In another incident in or around 2015, Prinzing became incensed at Johnson because he heard that Johnson, while at a funeral, was seated near a former DiMa dancer who left the company on purportedly bad terms.   Prinzing called Johnson into his office days later and verbally castigated her, threatening to fire her.   Instead of firing her, he punished her by putting her on a Sunday-Wednesday schedule for about a month, so she would not be able to work the more lucrative weekend shifts.   Prinzing, VanGelder, and

Steinbaugh all knew that servers like Plaintiff made more income during the weekend shifts as compared to the weekday shifts. Scheduling servers only for weekdays was thus used by DiMa to punish servers by reducing their income.

## III.     THE PREGNANCY SCHEDULE.

15.     In or around 2012, the other server at Sugar Daddy's, Nicole Watchman ("Watchman"), became pregnant. A couple months later, around the time her pregnancy became visibly apparent, DiMa management unilaterally changed Watchman's schedule so that she worked the less lucrative Sunday-Wednesday nights (the "pregnancy schedule"), with Johnson working the more lucrative Thursday-Saturday nights.

16.     Steinbaugh told Johnson at the time that the schedule was changed because Watchman was pregnant, her new residence would be too far from work to ensure attendance, and because they needed their stronger server (Johnson) working weekends when they were busier.

17.     The schedule change greatly upset Watchman, who would be required under the schedule to work more days for substantially less compensation. However, upon information and belief, Watchman chose not to complain about the discriminatory pregnancy schedule for fear of losing her job.

18.     In or around 2013, after Watchman gave birth, the schedule was changed back to the normal three-on-three-off schedule.

IV.   **JOHNSON BECOMES PREGNANT AND IS PLACED ON THE PREGNANCY SCHEDULE.**

19.   On or about April 14, 2017, Johnson disclosed to Steinbaugh that she was pregnant.

20.   During the same conversation, Johnson asked if the company would be willing to change the type of cleaner it used out of concern that it may not be healthy for her or her baby during HER pregnancy.  Steinbaugh initially resisted, but then reluctantly agreed, provided Johnson would pay for it.  Steinbaugh expressed his displeasure with the request, however, stating, "I'm not going to have any of this crazy stuff [going on around here]," or words to that effect.

21.   Then, on or about Wednesday, May 3, 2017, Steinbaugh mentioned in passing to Johnson that Prinzing was considering a schedule change.  Steinbaugh offered no further details and Johnson did not ask for any.

22.   But then on or about Sunday, May 7, 2017, on the first of what would typically be her three days on schedule, Johnson learned from manager Greg Griffin ("Griffin") that she was being placed on the pregnancy schedule starting immediately, working Sunday-Wednesday nights.  This new schedule would require Johnson to work more days for substantially less compensation, as was the case with Watchman when she was pregnant.  Moreover, the schedule would interfere with Johnson's ability to see her midwife, who was only available on Mondays and Tuesdays.

23.     Johnson asked for an explanation, but Griffin did not have one.  He said either that Prinzing had made the decision or that Steinbaugh had told him that the new schedule was being implemented.

24.     On Tuesday May 9, 2017, the last of what would typically be her three days on schedule, Johnson called Lisa in DiMa Human Resources and asked why her schedule was being changed against her will.  Lisa stated she was unaware of the change but would reach out to Steinbaugh for clarification.

25.     Steinbaugh subsequently called Johnson and offered no reasons, stating only that the schedule change was Prinzing's "final" decision.  Steinbaugh suggested Johnson contact Prinzing for an explanation.

26.     Johnson called for Prinzing and left a message requesting a call back. Prinzing did not call Johnson back.

27.     Johnson concluded that she was placed on the pregnancy schedule because she was pregnant and would soon be showing.  She therefore sent Steinbaugh a text message stating she would not be able to adhere to the new schedule, and that she would instead work her normal three-on-three-off schedule, which meant her next shift would be Saturday.

28.     Steinbaugh later arrived at Sugar Daddy's and asked to meet with Johnson. During the meeting, Steinbaugh stated that Prinzing "would have had a heart attack" if he had seen Johnson's text message, meaning Prinzing would have been very angry.

29.     Steinbaugh directed Johnson to adhere to the new schedule.  Johnson asked for the reasons behind the change.  Steinbaugh responded, "This is what we did when

Nicole [Watchman] was pregnant." He went on to state that the weekends bring in a different crowd, and that it would be better for Johnson, as a pregnant woman, to not be around that crowd. Johnson objected, stating that the same sorts of people came in on the weekends as on weekdays. Johnson further explained that the pregnancy schedule violated the Pregnancy Discrimination Act and stated that she felt discriminated against. Steinbaugh showed no concern, reiterating that Prinzing had made the final decision. Johnson then told him again that she felt discriminated against, to which Steinbaugh responded by threatening her with termination, stating that if she could not adhere to the new schedule then she could find another job.

30.     Later, after the meeting, Johnson sent Steinbaugh another text message objecting to the new schedule, and stating that she would come in on Saturday for her typically scheduled shift.

31.     Johnson confirmed on Tuesday, May 9th that Watchman would work on Wednesday, May 10th. Moreover, Johnson went to Sugar Daddy's on May 10th before it opened to verify Watchman was covering the shift. Watchman and Johnson had previously covered each other's shifts, including on short notice, for a variety of reasons, and the practice violated no company policy.

## V.     JOHNSON'S EMPLOYMENT IS TERMINATED.

32.     Under both her normal schedule and the pregnancy schedule, Johnson was off work on Thursday May 11, 2017, and Friday, May 12, 2017.

33.     On or about Friday, May 12, 2017, Johnson dropped off a letter she drafted to Steinbaugh at Sugar Daddy's. She also sent a copy via certified mail to DiMa's

corporate office.  In the letter, Johnson asked to keep her job and be allowed to work her typical three-on-three-off schedule.  She noted that she had never received any warnings, nor had she been told that her performance was poor.  She also reported i that Steinbaugh had cited her pregnancy as the sole reason for the schedule change, and reiterated that pregnancy is a protected status under the Pregnancy Discrimination Act.

34.     Johnson received no response to her May 12th letter, so on Saturday, May 13, 2017 around 4:00 pm, she went in to work what should have been the first of three days on the usual schedule.  Concerned about what may happen upon her arrival, her fiancée accompanied her into the building to act as a witness.

35.     After they entered, VanGelder, who was at the club, angrily asked Johnson what she was doing there.  Johnson told him she was there to work her regularly scheduled shift.  VanGelder asserted that the schedule had changed, and then pressured Johnson to meet with him privately, away from Johnson's fiancée.

36.     During her private meeting with VanGelder, Johnson again expressed her opposition to the pregnancy schedule.  VanGelder accused Johnson of being only concerned about herself and not having the company at heart.  He claimed that the reason for the schedule change was that Griffin needed time off due to a death in the family, and they wanted a more reliable server to be available on Sunday through Wednesday to help the managers who were filling in.

37.     VanGelder's explanation for the schedule change was untrue.  Griffin did not regularly work a Sunday through Wednesday shift.  Moreover, Johnson had never worked as a manager, had no training as a manager, and had never filled in for managers.  Indeed,

to Johnson's knowledge, no server had ever filled in for a manager. Furthermore, VanGelder's explanation conflicted with Steinbaugh's statement that the schedule was being hanged due to Johnson's pregnancy.

38.     Johnson a told VanGelder that she had been placed on the new schedule because she was pregnant and believed it was discriminatory. VanGelder asked Johnson during the meeting whether she was represented by a lawyer. Eventually, VanGelder escorted Johnson from the premises.

39.     At approximately 5 pm on May 13th, only about 10 or 15 minutes after Johnson was removed from the club premises for reporting pregnancy discrimination, VanGelder called Johnson and told her that her employment was terminated. When Johnson asked why she was being terminated, VanGelder refused to give a reason, simply repeating that her employment was terminated.

40.     In response to Johnson's written request for the reason for her discharge, VanGelder claimed that Johnson was terminated for "failure to come to work for a scheduled shift."

41.     On September 10, 2018, the Minnesota Department of Human Rights issued a determination that probable cause exists to believe that an unfair discriminatory practice was committed.

42.     On February 12, 2019, at Plaintiff's request, the Equal Employment Opportunity Commission issued Johnson a Notice of Right to Sue.

43.     On March 11, 2019, Johnson notified the Minnesota Department of Human Rights of her intent to initiate this civil action, and then submitted a request for withdrawal the morning of April 4, 2019.

## CAUSES OF ACTION

## COUNT I

## PREGNANCY DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

44.     By reference hereto, Plaintiff incorporates the paragraphs above.

45.     During all relevant times herein, Johnson was DiMa's "employee" within the meaning of 42 U.S.C. § 2000e(f) and DiMa was Johnson's "employer" within the meaning of 42 U.S.C. § 2000e(b).

46.     42 U.S.C. § 2000e-2(a)(1) of Title VII of the Civil Rights Act of 1964 prohibits employers from discharging or otherwise discriminating against any employee with respect to her compensation, terms, conditions, or privileges of employment, because of the employee's sex. 42 U.S.C. § 2000e-2(a).

47.     42 U.S.C. § 2000e(k) provides that the term "because of sex" includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k) also requires that women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes as other persons not so affected but similar in their ability or inability to work.

48.     DiMa discriminated against Johnson on the basis of her pregnancy in violation of 42 U.S.C. § 2000e-2(a)(1) by unilaterally placing her on a less lucrative schedule because of her pregnancy and then terminating her employment.

49.     As a result of DiMa's violations of 42 U.S.C. § 2000e-2(a)(1), Johnson has suffered and continues to suffer damages, including but not limited to loss of income, emotional distress, and other damages in excess of $75,000.

## COUNT II

## PREGNANCY DISCRIMINATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

50.     By reference hereto, Plaintiff incorporates the paragraphs above.

51.     During all relevant times herein, Johnson was DiMa's "employee" within the meaning of Minn. Stat. § 363A.03, sub. 15, and Dima was Johnson's "employer" within the meaning of Minn. Stat. § 363A.03, subd. 16.

52.     Minn. Stat. § 363A.08, subd. 2 of the Minnesota Human Rights Act provides that it is an unfair employment practice for an employer, because of sex, to discharge an employee or discriminate against a person with respect to compensation, terms, conditions, or privileges of employment.  The term "sex" is defined to include "pregnancy, childbirth, and disabilities related to pregnancy and childbirth." Minn. Stat. § 363A.03, subd. 42.

53.     Minn. Stat. § 363A.08, subd. 5 of the Minnesota Human Rights Act further provides that it is an unfair employment practice for an employer not to treat women affected by pregnancy, childbirth, or disabilities related to pregnancy or childbirth, the

same as other persons who are not so affected but who are similar in their ability or inability to work.

54.     DiMa discriminated against Johnson on the basis of her pregnancy in violation of Minn. Stat. § 363A.08 by unilaterally placing her on a less lucrative schedule because of her pregnancy and then terminating her employment.

55.     As a result of DiMa's violations of Minn. Stat. § 363A.08, Johnson has suffered and continues to suffer damages, including but not limited to loss of income, emotional distress, and other damages in excess of $75,000.

## COUNT III

## RETALIATORY DISCHARGE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

56.     By reference hereto, Plaintiff incorporates the paragraphs above.

57.     42 U.S.C. § 2000e-3(a) of Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an employee because the employee has opposed any practice that violates Title VII.

58.     Johnson engaged in protected conduct under Title VII by repeatedly reporting that the pregnancy schedule was discriminatory, and by refusing to adhere to the pregnancy schedule.

59.     DiMa retaliated against Johnson because of her protected conduct by terminating her employment.

60.     As a direct and proximate result of DiMa's violation of Title VII, Johnson has suffered and continues to suffer damages, including but not limited to loss of income, emotional distress, and other damages in excess of $75,000.

## COUNT IV

## REPRISAL IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

61.     By reference hereto, Plaintiff incorporates the paragraphs above.

62.     Minn. Stat. § 363A.15 of the Minnesota Human Rights Act prohibits employers from engaging in any reprisal against a person because that person opposed a practice forbidden under the Minnesota Human Rights Act.

63.     Johnson engaged in protected conduct under the Minnesota Human Rights Act by reporting that the pregnancy schedule was discriminatory, and by refusing to adhere to the pregnancy schedule.

64.     DiMa engaged in reprisal against Johnson because of her protected conduct by terminating her employment.

65.     As a direct and proximate result of DiMa's violation of the Minnesota Human Rights Act, Johnson has suffered and continues to suffer damages, including but not limited to loss of income, emotional distress, and other damages in excess of $75,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Nicole Johnson prays for judgment against Defendant Di Ma Corporation providing the following relief:

A.     For all damages available under Title VII of the Civil Rights Act of 1964 and the Minnesota Human Rights Act, including but not necessarily limited to

compensatory damages including loss of past and future income, emotional distress, punitive damages, and related damages in excess of $75,000;

B.     For costs, disbursements, and attorneys' fees; and

C.     For such other and further relief and the court deems just and equitable.

Dated: 4-4-19                                   s/ Nicholas G. B. May
                                                Nicholas G. B. May, #287106
                                                David H. Redden, #391496
                                                Attorneys for Plaintiff
                                                **FABIAN MAY & ANDERSON, PLLP**
                                                1625 Medical Arts Building
                                                825 Nicollet Mall
                                                Minneapolis, MN 55402
                                                Telephone: (612) 353-3340
                                                Fax: (612) 455-2217
                                                E-mail:  nmay@fmalawyers.com
                                                         dredden@fmalawyers.com